

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 8971 | DATE | 11/5/2003 |
| CASE TITLE | Villarreal vs. Chicago Transit Authority | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. For the reasons stated in the attached memorandum opinion and order, defendant's motion to strike plaintiff's Local Rule 56.1(b)(3) statement of additional facts and responses to defendant's Local Rule 56.1(a)(3) statement of facts is granted in part and denied in part. Defendant's motion for summary judgment is granted [8-1]. Case dismissed. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV - 5 2003 | |
| | Notified counsel by telephone. | | date docketed | 19 |
| ✓ | Docketing to mail notices. | | 15 | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MF | courtroom deputy's initials | 03 NOV -5 PM 2:__ Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

EFRAIN VILLARREAL, )
)
Plaintiff, )
) No. 02 C 8971
v. )
) Judge John W. Darrah
CHICAGO TRANSIT AUTHORITY, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Efrain Villarreal, filed a three-count complaint against Defendant, Chicago Transit Authority, alleging race and national origin discrimination and retaliation. Presently before the Court is Defendant's Motion for Summary Judgment.

Defendant also seeks to strike portions of Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts and Responses to Defendant's Local Rule 56.1(a)(3) Statement of Facts.

A party opposing a motion for summary judgment must serve and file, in response to the movant's Local Rule 56.1(a)(3) statement of undisputed facts, "a response to each numbered paragraph in the moving party's statements, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon...." The material facts set forth by a moving party are deemed admitted unless controverted by the statement of the opposing party. L.R. 56.1(b)(3)(B); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir. 1995).

In order for the non-moving party to introduce new facts that go beyond a denial of the moving party's facts, the non-moving party must file "a statement, consisting of short numbered

19

paragraphs ... including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B); *Dade v. Sherwin-Williams Co.*, 128 F.3d 1135, 1140 (7th Cir. 1997) (district court had discretion to refuse to consider additional facts submitted by non-moving party when non-moving party failed to comply with local rule).

Plaintiff moves to strike Plaintiff's responses to Defendant's 56.1(a)(3) Statement of Facts paragraphs 6, 43-45, 60, 82, 91, 119, 139, 144-145, 148, 164, 177-179, 181, 192-193, 196, and 206 and paragraphs 128-165 of Plaintiff's 56.1(b)(3) Statements of Facts because Plaintiff relies upon his unsigned and non-notarized affidavit to oppose Defendant's statements of fact. Unsigned affidavits do not comply with Fed. R. Civ. Proc. 56(e) and should be stricken. *See DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990); *Lamkey v. Roth*, 1997 WL 89125 (N.D. Ill. Feb. 26, 1997). However, Plaintiff has subsequently submitted a signed and notarized affidavit in response to Defendant's motion. Accordingly, Defendant's Motion to Strike is denied as to these responses and paragraphs.

Defendant seeks to strike Plaintiff's responses to paragraphs 38, 43, 45, 82, 91, 92, 97, 164, 178, 179, 181, 186, 196, and 206 because Plaintiff's responses fail to respond to the substance of the factual assertions and, instead, relies upon self-serving assertions that are not based on sworn testimony. A review of these responses demonstrates that Plaintiff's responses to the above paragraphs are based on self-serving assertions that are not based on sworn testimony. Accordingly, these responses are stricken.

Lastly, Defendant moves to strike several paragraphs of Plaintiff's 56.1(b)(3) Statement of Facts because they are not supported by the cited record. Defendant has also denied these statements based on the failure of the record to support the paragraphs. Accordingly, these paragraphs will only

2

be considered if they comply with the appropriate rules and need not be stricken.

## BACKGROUND

Villarreal, a Hispanic of Mexican origin, was hired by the CTA in January 1979. (Def.'s 56.1(a)(3) Statement ¶¶ 2, 5). Villarreal entered CTA management in 1984 or 1985. (Id., ¶ 6). In December 1997, Villarreal became a transportation manager for the vehicle operations department of the CTA. (Id., ¶ 7). Villarreal was one of thirteen transportation managers, all of whom reported directly to a transportation manager at large. (Id., ¶ 11). Villarreal's duties included coordinating and supervising customer assistants, rail supervisors, rail operators, and other employees. (Id., ¶ 13). Transportation managers are required to conduct employee interviews and discipline hearings. (Id., ¶ 14). Accordingly, they must have a thorough knowledge of CTA's general rules, corrective action guidelines, and rail system rules. (Id., ¶ 15).

During 2001, Villarreal worked under the general supervision of Robert Takagi, General Manager of CTA's Red, Yellow, and Purple Lines. (Def.'s 56.1(a)(3) Statement ¶ 9). Takagi reported directly to William R. Mooney, Vice President of Rail Operations. (Id., ¶ 10).

In August 2000, Villarreal received a written performance evaluation for his work as a transportation manager during the period of 1999 to 2000. (Def.'s 56.1 (a)(3) Statement ¶ 17). Villarreal received an over score of 2.8, in the point range for "meeting expectations". In the section for employee comments, Villarreal wrote: "As a manager, I do need to improve on all aspects to be what the authority would really smile at." (Id., ¶ 18).

On March 20, 2001, a female rail supervisor at CTA's Linden Station asked if she could speak to Villarreal. (Def.'s 56.1(a)(3) Statement ¶ 19). At Villarreal's request, the supervisor drove Villarreal in her personal car from the Linden Station to the CTA's Howard Street Terminal. (Id.,

3

¶ 20). While in the car, the rail supervisor asked Villarreal if she should seek a promotion to rail instructor. (Id., ¶ 21). During the conversation, the rail supervisor's reputation was discussed. (Id., ¶ 22). Villarreal told the rail supervisor "that someone is trying to tear your reputation down". (Id., ¶ 23). After asking for clarification, Villarreal told the rail supervisor that a male was telling others that he was having a sexual relationship with her. Because both the male and the rail supervisor were married to other CTA employees, the rail supervisor's reputation was not good. (Id., ¶ 24).

Soon after the above conversation, Rita Jackson, a CTA manager at large, summoned Villarreal to her office. (Def.'s 56.1(a)(3) Statement ¶ 25). Jackson informed Villarreal that the female rail supervisor had submitted a written complaint about Villarreal's remarks. (Id., ¶ 26). The rail supervisor's complaint, dated March 22, stated that Villarreal made the following comments to her: "By the way, next time, choose someone that doesn't kiss and tell; [A manager within the CTA] told me he had sex with you at your house; and I can see what [name deleted] or anyone would say that you are very pretty." (Id., ¶ 27). She further stated, "As one of my managers, I felt his conduct to be atrocious and unprofessional. His remarks were unbecoming and uncalled for. My confidence in him as my manager is tarnished as a result of this occurrence." (Id., ¶ 28).

Villarreal admitted to Jackson that he asked the rail supervisor for a ride to the Howard Terminal in her personal vehicle. (Def.'s 56.1(a)(3) Statement ¶ 30). Villarreal also admitted to telling the rail supervisor that a CTA employee bragged about having sex with the supervisor at her home. (Id., ¶ 31). Villarreal told Jackson that he advised the rail supervisor "that if she deals with someone, don't deal with someone who kisses and tells." (Id., ¶ 32).

Jackson submitted the rail supervisor's complaint and a memorandum detailing Jackson's investigation of the complaint to Takagi. (Def.'s 56.1(a)(3) Statement ¶ 33). Takagi directed

4

Villarreal to submit a written response to the rail supervisor's complaint. (Id., ¶ 35).

Villarreal submitted a memorandum to Takagi dated April 10. In this memorandum, Villarreal wrote, in part, "the conversation went to the reputation as a person with the company. I told her I heard a negative rumor about [her]. She asked what the rumor was, so I told her that [] informed me ... that he had sex with her at her house. My comment was that [] (her husband) would kill him." (Def.'s 56.1(a)(3) Statement ¶ 36). After reviewing Villarreal's memorandum, Takagi concluded that Villarreal's conduct was "very, very questionable as a manager". (Id., ¶ 37). Takagi was also concerned that Villarreal was riding in the rail supervisor's vehicle because the Executive Vice President of Transit Operations had previously issued an executive order prohibiting the use of personal vehicles while on CTA duty. (Id., ¶¶ 38-39).

As a result of the incident with the rail supervisor, Takagi scheduled a disciplinary interview with Villarreal for April 20. (Def.'s 56.1(a)(3) Statement ¶ 41). In the interview, Villarreal again admitted telling the rail supervisor about a rumor he heard concerning her sexual activity. (Id., ¶ 42). Villarreal also admitted that the conversation occurred in the rail supervisor's personal vehicle. (Id., ¶ 43). Takagi told Villarreal that a manager must lead by example and that he would not tolerate having such discussions with subordinates. (Id., ¶ 44). Takagi also reminded Villarreal that he was prohibited from being in a personal vehicle while on CTA duty. (Id., ¶ 45).

Takagi charged Villarreal with violating the following roles from CTA's General Rule Book Governing All Employees: conduct unbecoming of an employee, unauthorized use of personal car for CTA business, and failure to use best judgment. (Def.'s 56.1(a)(3) Statement 46). Takagi issued Villarreal a final written warning and a corrective case interview. (Id., ¶ 47). Villarreal reviewed and signed the interview records. (Id., ¶ 49). Neither the final written warning nor the corrective

case interview made reference to any charge of sexual harassment. (Id., ¶ 50).

Subsequently, Villarreal submitted a memorandum dated May 19 to Mooney. (Def.'s 56.1(a)(3) Statement ¶ 54). Villarreal's memorandum stated that Takagi issued Villarreal a corrective case interview "for being in a vehicle and for sexual harassment". (Id., ¶ 55). Villarreal asked Mooney to "look into this mess, and give a fair resolution". (Id., ¶ 56).

On July 5, Mooney, Takagi, and Villarreal met to discuss the discipline that Takagi had issued to Villarreal. (Def.'s 565.1(a)(3) Statement ¶¶ 57-58). Villarreal asked Mooney to remove the discipline report from his record. (Id., ¶ 59). Mooney agreed to keep the discipline records in Villarreal's personnel file until Villarreal's next performance evaluation; then they would be removed. (Id., ¶ 60).

At this same meeting, Mooney, Takagi, and Villarreal also discussed Villarreal's request to take Sundays off. (Def.'s 56.1(a)(3) Statement ¶ 62). Takagi and Mooney agreed to give Villarreal Sundays off, effective in August. (Id., ¶ 63).

About three days after his April 20 disciplinary interview, Villarreal told a CTA female customer assistant (the "CA") the details of his conversation with the female rail supervisor. (Def.'s 56.1(a)(3) Statement 64). The CA was Villarreal's subordinate. (Id., ¶ 65). Villarreal's rational for repeating the conversation to a female subordinate was that he wanted the CA to ask her mother, a previous co-worker of Villarreal, if she thought the rail supervisor's conversation constituted sexual harassment. (Id., ¶ 66).

Villarreal had several other discussions with the CA, during the summer, which led the CA to complain about Villarreal to Derrick Patterson, another transportation manager. (Def.'s 56.1(a)(3) Statement ¶ 69). The CA submitted a two-page report dated September 16. (Id., ¶ 70).

The CA's report contained several allegations about Villarreal, dating back to late spring. The report stated that Villarreal told the CA that he was almost removed from service because someone had filed a sexual harassment suit against him. He then attempted to touch the assistant's vaginal area. It also stated that during the Taste of Chicago, the CA left her booth to respond to a call button and that, when she returned, Villarreal was in her booth. Villarreal threatened to write up the CA for being away from her assigned work location. About a week after the second incident, Villarreal stormed out of the CA's booth after he found she had left the booth. Villarreal approached the CA another time when she was away from her assigned work location and asked why she was not in her booth. The CA later found out that Villarreal was going to write her up, but another CA talked Villarreal out of writing her up. Villarreal decided not to write up the CA for another incident on September 13 because the CA called her mother, and her mother asked Villarreal not to take the CA out of service. (Id., ¶ 71).

The CA's report and a memorandum by Patterson were forwarded to Takagi. (Def.'s 56.1(a)(3) Statement ¶ 74). Takagi reviewed the report and memorandum and asked Villarreal to provide a written statement responding to the CA's charges. (Id., ¶ 76).

Villarreal submitted a memorandum to Takagi dated September 28. (Def.'s 56.1(a)(3) Statement ¶ 77). Villarreal denied touching the CA. Villarreal admitted to not writing up the CA based on conversations with another CA and the CA's mother. (Id., ¶¶ 78-80). Villarreal's memorandum concludes: "I no longer feel comfortable performing my job duties if she [the CA] is the one in question. I cannot talk to her or write her up for a violation as she had put in her report. In the future, is [sic] she does wrong I feel I must leave it alone now...." (Id., ¶ 82). Takagi was concerned about the statements in Villarreal's memorandum because they confirmed numerous

7

incidents where the CA left her assigned work location and was not disciplined by Villarreal. (Id. ¶ 82). He was also concerned about Villarreal's comment that he, Villarreal, was not comfortable performing his job duties with respect to the CA. (Id. ¶ 83).

After reviewing Villarreal's memorandum, Takagi met with the CA and Linda Lee, an administrative manager at large. (Def.'s 56.1(a)(3) Statement ¶ 84). Takagi then prepared a memorandum to Mooney concerning this meeting. Takagi also scheduled an interview with Villarreal for October 2. (Id., ¶ 85). Prior to the October 2 interview, Takagi prepared six written questions for Villarreal concerning the CA's allegations. (Id., ¶ 86). At the interview, Takagi asked Villarreal to provide written answers to these questions. (Id., ¶ 87).

In response to the questions, Villarreal stated that he did not physically touch the CA and that he relied upon another CA to talk to the CA who was not at her work location because he thought he "could get the employee to have the other employee turn it around...." (Def.'s 56.1(a)(3) Statement ¶¶ 89-90). Villarreal's responses concerned Takagi because it confirmed that Villarreal not only failed to discipline the CA but also that he failed to document several incidents in which the CA had left her assigned work area. (Id., ¶ 91). Takagi was also concerned that Villarreal chose to rely on a non-management employee, as well as the CA's mother, to correct the CA's behavior instead of taking the appropriate disciplinary action himself. (Id., ¶ 92). Takagi concluded that Villarreal was not fulfilling his obligations, duties, and responsibilities as a manager of the CTA. (Id., ¶ 94).

Villarreal admits that he did not discipline the CA at least one time when she was not at her work station because he was "too irritated to talk to the person and be professional". (Def.'s 56.1(a)(3) Statement ¶ 99). He also admits that he did not discipline the CA after finding her away

8

from her work station another time because the CA's mother asked him not to discipline her. (Id., ¶100).

At the October 2 interview, Takagi and Villarreal also discussed Villarreal's actions on September 25 when he continued through a red "danger" signal. (Def.'s 56.1(a)(3) Statement ¶ 104). Villarreal stated that he reported to work on that day and decided to take control of a southbound train operated by CTA rail operator Rhonda Gary. (Id., ¶¶ 105-106). He prepared to operate the train and then heard what he believes was a signal to move the train. (Id., ¶ 107). He proceeded to move the train without looking to see if it "had a line up". He went "with blind faith ... proceeded ... [and] ran the signal." (Id., ¶ 108).

The procedure that is followed when an operator runs a red signal is that the operator is to notify CTA's Control Center about running the signal. (Def.'s 56.1(a)(3) Statement ¶ 110). The operator is then removed from service and tested for drugs and alcohol. (Id., ¶ 111). The operator is also interviewed about the incident. (Id., ¶ 113). A manager then determines whether the operator violated any safety rules and should be disciplined. (Id., ¶ 114). Managers, such as Villarreal, know these procedures. (Id., ¶ 115).

Notwithstanding the above procedure and Villarreal's knowledge of that procedure, after he ran the red signal, Villarreal did not notify the CTA Control Center and did not remove himself from service. (Def.'s 56.1(a)(3) Statement ¶ 117). Instead, Villarreal used a short-range radio to contact a towerman, James Russell. (Id., ¶ 118). Russell "cranked the track back into position" so that the train could proceed. (Id., ¶ 119). Villarreal did not contact the CTA Control Center because he was "thinking of informing [his] boss". (Id., ¶ 120). Although his boss, Heard, was at the station, Villarreal did not attempt to contact him. (Id., ¶ 122). Instead, Villarreal proceeded to operate the

9

train. Villarreal admits that he continued to operate the train knowing that he "was going to get disciplined". (Id., ¶ 124).

Once Heard realized that Villarreal was the employee who ran the red signal and continued to operate the train, Heard radioed Villarreal and told him to return to the Howard Terminal. (Def.'s 56.1(a)(3) Statement ¶ 125). When Villarreal returned to the Howard Terminal, he admitted to Heard that he ran the red signal. (Id., ¶ 127). Following Villarreal's drug and alcohol test, Heard told Villarreal "to go on home and get some rest". (Id., ¶¶ 128-129). Heard also told Villarreal to return the next day at 8:00 a.m. (Id., ¶ 131).

Heard did not prepare a formal interview record for Villarreal on the date of the incident. (Def.'s 56.1(a)(3) Statement ¶ 132). Heard testified that he did not give Villarreal an interview record because he was trying to use a little professional courtesy in light of Villarreal's manager status. Villarreal appeared upset, so Heard decided "to hold off on some of the formalities to the next day" when Villarreal would return. (Id., ¶ 132). Heard did not specifically tell Villarreal that he was "out of service". (Id., ¶ 134).

When Heard told Villarreal to go home, Villarreal did not ask Heard any questions and did not tell Heard that he had planned on training some CTA employees at the 95th Street Terminal later that day. (Def.'s 56.1(a)(3) Statement ¶ 136). At about 10:00 p.m. that same night, Villarreal went to the 95th Street Terminal because he had previously promised some CTA employees that he would instruct them on troubleshooting techniques. (Id., ¶¶ 137-138).

When Villarreal arrived at the 95th Street Terminal, he told the transportation manager on duty, Kenneth Beauford, that he would be training employees in the terminal yard. (Def.'s 56.1(a)(3) Statement ¶¶ 140-141). Beauford had never seen Villarreal train employees in the yard before. (Id.,

¶ 142). Beauford had also heard that Villarreal was out of service and asked Villarreal if he was out of service. (Id., ¶ 143). Villarreal said he did not know his status. (Id., ¶ 144). Beauford was not comfortable with Villarreal's working during his shift, but Villarreal refused to leave because he had an obligation to the employees that he had previously agreed to train. (Id., ¶¶ 145-146).

When Villarreal returned to work the next day, he met with Lee. (Def.'s 56.1(a)(3) Statement ¶ 149). At the meeting, they discussed a report that Villarreal had prepared the previous day concerning the running of the red signal. (Id., ¶ 150). Lee told Villarreal that his job was on the line and that Villarreal needed to write a detailed report. (Id., ¶ 151). Villarreal completed a longer report in which he stated, in part:

> I took charge of the train ... I failed to look at signal X-74 that was at danger. I ran the trip ... I made the mistake in judgment and should have notified control myself and not rely on someone else ... I did not want to call control via the radio due to the embarrassment in making an error and advertising to all that were monitoring the radio ... I failed to have a clear understanding that I was out of service. I was instructed to go home and get some rest and come see him at 800 hours ... I was at error in running the signal. I do not like admitting that I blew it. But I did.

(Id., ¶ 152).

After Villarreal completed his report, he was interviewed by Heard about the incident. (Def.'s 56.1(a)(3) Statement ¶ 153). At the interview, Villarreal admitted that he ran the red signal and that he failed to notify the CTA Control Center. (Id., ¶ 155). Heard prepared an interview record, which Villarreal signed. (Id., ¶ 156). Heard advised Villarreal that he was suspended and that he would be notified to report to Takagi for further disposition. (Id., ¶ 157). Heard gave Villarreal a suspension notice. The suspension notice charged Villarreal with abuse of company time and poor work performance. (Id., ¶¶ 158-159). It also charged Villarreal with violating rail system

11

rules, including proceeding through a red signal, failing to devote full attention to the proper performance of duties, and failure to look ahead and be constantly alert for any condition which may cause injury or damage. (Id., ¶ 160).

Heard also took disciplinary action against other employees involved in the September 25th incident. He re-instructed Gary on reporting incidents when they occur, no matter who is involved. (Def.'s 56.1(a)(3) Statement ¶ 161). Rail supervisor Robert Bolton, who helped reset a switch so Villarreal could proceed, was re-instructed on reporting incidents to the CTA Control Center. (Id., ¶ 162). Russell was referred to instruction for failing to notify the CTA Control Center after he saw Villarreal run the red signal. (Id., ¶ 163). Heard did not discipline two other employees who were present when Villarreal ran the red signal because neither employee was on duty when Villarreal ran the red signal. (Id., ¶ 164).

Heard completed his investigation of Villarreal's actions of September 25th by collecting reports from all other CTA employees involved in the incident. (Def.'s 56.1(a)(3) Statement ¶ 165). Heard then forwarded the reports to Takagi. (Id., ¶ 166). Takagi reviewed the reports prior to meeting with Villarreal on October 2. (Id., ¶ 167). Takagi also prepared written questions about the incident and presented them to Villarreal at the October 2 interview. (Id., ¶ 168). Villarreal provided Takagi written answers to these questions in the interview. (Id., ¶ 169).

Takagi had several concerns about Villarreal's actions of September 25th and Villarreal's explanations for those actions. (Def.'s 56.1(a)(3) Statement ¶ 171). For instance, Villarreal stated that he did not notify the CTA Control Center because he wanted to advise Heard by telephone. However, even though there was a phone at the station and Villarreal had a radio, as well as the fact that Heard was at the station, Villarreal did not contact Heard. (Id., ¶¶ 172-173). Takagi concluded

12

that Villarreal exercised poor judgment when he went to the 95th Street Terminal the same night of the incident because an out-of-service employee should not be in the train yard. (Id., ¶ 178). Takagi did not discipline Heard for not immediately writing up Villarreal on September 25th because Heard finalized the paperwork the next morning. (Id., ¶ 180).

At the conclusion of the October 2 interview, Takagi presented Villarreal an interview record directing Villarreal to meet with Mooney on October 11. (Def.'s 56.1(a)(3) Statement ¶ 182). The interview record notified Villarreal that Takagi was recommending Villarreal's discharge for violating the following CTA rules: failure of obedience to rules, conduct unbecoming of an employee, abuse of company time, poor work performance, and failure to report an incident. (Id., ¶ 183). Takagi also charged Villarreal with violating the "Operation on Site" rule by proceeding through the red signal. (Id., ¶ 184).

Takagi also wrote a memorandum to Mooney recommending Villarreal's discharge. (Def.'s 56.1(a)(3) Statement ¶ 185). Takagi's recommendation was based on the following conditions: (1) Villarreals' conduct with the female rail supervisor, (2) the multiple incidents with the CA in which Villarreal failed to document the incidents or discipline the CA for repeatedly leaving her assigned work locations, and (3) the September 25 incident. (Id., ¶ 186).

On October 11, Mooney conducted a discharge interview with Villarreal. (Def.'s 56.1(a)(3) Statement ¶ 188). Mooney told Villarreal that he wanted Villarreal to explain his thought process behind his conduct because the "real issue was where was Mr. Villarreal's head, and how was he making management decisions in the course of the incidents". (Id., ¶ 190). Villarreal acknowledged to Mooney that he was aware of the proper procedures when an individual runs a red signal. (Id., ¶¶ 191-192). Villarreal told Mooney that he did not call the CTA Control Center because he was

13

embarrassed that he had made a mistake. (Id., ¶ 193). Villarreal also told Mooney that he was only told to go home after the incident so he did not know that he was out of service, and that was why he went to the 95th Street Terminal later that same day. (Id., ¶ 196).

Mooney concluded that Villarreal exercised poor managerial judgment in light of all of the incidents brought to his attention. (Def.'s 56.1(a)(3) Statement ¶¶ 201-208). After giving Villarreal an opportunity to justify why he should not be discharged, Mooney concluded that Villarreal failed to understand the duties of a manager and the ramifications of his actions. (Id., ¶ 209). Mooney informed Villarreal that he was discharged. (Id., ¶ 211).

As to Villarreal's retaliation claim, on or about June 21, 2001, Villarreal filed an EEOC charge of religious discrimination against the CTA for denying Villarreal permission to take Sundays off from work. (Def,'s 56.1(a)(3) Statement ¶ 234). Villarreal only discussed his EEOC charge with a member of CTA's Equal Employment Opportunity/Affirmative Action Unit and a CTA attorney. (Id., ¶ 235). Takagi first saw Villarreal's EEOC charge in February 2002. (Id., ¶ 236). Villarreal never told Takagi that he felt Takagi discriminated against him because of his religion or his request to have Sundays off from work. (Id., ¶ 237). Villarreal never told Mooney he had filed a discrimination charge with the EEOC. (Id., ¶ 238). Mooney first saw Villarreal's EEOC charge in July 2003. (Id., ¶ 239).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in

14

the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff may prove discrimination through either direct or circumstantial evidence or the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (*McDonnell*). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). Direct evidence is defined as "evidence 'which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997) (citation omitted). In an employment discrimination case, direct evidence must speak directly to the issue of discriminatory intent; and it must relate to the specific employment decision in question. *Cowen v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997).

Plaintiff concedes that he does not have direct evidence of discrimination and that he must proceed under the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973). In order to establish a *prima facie* case under the indirect method, the plaintiff is required to show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) that other similarly situated employees not in the protected class were treated more favorably. *See Jones v. Union Pacific R.R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002). If the plaintiff meets this burden, then the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for its action. *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002)

(*Peters*). If defendant meets this burden, the burden shifts back to the plaintiff to show that the proffered reason "was not its true reason, but was a pretext – 'a dishonest explanation, a lie rather than an oddity or an error'". *Peters*, 307 F.3d at 545, quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

Defendant concedes that Plaintiff has established the first and third prongs of a *prima facie* case. As to the second prong of the test, Plaintiff argues that he was performing his job to the satisfaction of the CTA. Plaintiff first contends that his August 2000 performance review in which he received a "meets expectation" demonstrates that he was meeting the CTA's expectations. However, the August 2000 review was for Plaintiff's work performance in 1999 through August 2000; the reasons for Plaintiff's termination took place after the review. Accordingly, the previous review does not demonstrate that Plaintiff was meeting the CTA's expectations in September/October 2001.

Plaintiff next contends that his conduct in April 2001 does not demonstrate that he was not meeting the CTA's expectations because he received a corrective case interview, which is a "positive action which allows time for improvement and help to get there". However, irregardless of the purpose of the corrective case interview to allow time for improvement, the undisputed facts show that Plaintiff admitted to the improper conduct in April 2001 and that he continued to have employment issues shortly thereafter, including the failure to properly manage a subordinate and running the red signal.

Lastly, Plaintiff contends that the two other incidents that led to his termination should be "questioned" because Heard was not disciplined for failing to write up Plaintiff the day that he ran the red signal. The fact that Heard waited until the next day to write up Plaintiff for his admitted

16

running of the red signal fails to demonstrate that Plaintiff was meeting the CTA's expectations. Plaintiff was not disciplined or terminated for failing to write up a subordinate until the day after he learned of an infraction. Instead, the undisputed facts demonstrate that Plaintiff was terminated because of the three incidents that the CTA decided demonstrated Plaintiff was not performing his job responsibilities properly. Plaintiff admits that the three reasons cited by Defendant for its termination occurred. Plaintiff has failed to demonstrate that a genuine issue of material fact exists as to whether he was meeting his employer's expectations.

Furthermore, Plaintiff has failed to establish that other similarly situated employees not in the protected class were treated more favorably. Plaintiff argues that Heard, an African American, was neither disciplined or discharged when he failed to prepare a formal disciplinary document on the day that Plaintiff ran the red signal. However, Plaintiff's comparison to Heard is invalid. Plaintiff was disciplined and discharged for several rule violations from a series of incidents, not merely because he failed to document or take immediate disciplinary action against a subordinate. Plaintiff offers no evidence that Heard, or anyone else, engaged in the same misconduct as Plaintiff but was not similarly disciplined or discharged. Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination.

Assuming arguendo that Plaintiff had presented a *prima facie* case, he has failed to demonstrate that Defendant's proffered reason for terminating his employment was a pretext to discrimination.

To demonstrate that Defendant's articulated reason for her discharge was pretext, Plaintiff must show that Defendant's reason for his discharge either: (1) had no basis in fact, (2) was insufficient to motivate his discharge, or (3) did not actually motivate his discharge. *See Velasco*

*v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001).

Plaintiff argues that the CTA's failure to discipline Heard for failing to write up Plaintiff on the day that he ran the red signal is evidence of pretext. However, as discussed above, Heard did not engage in the same infractions as Plaintiff; and Plaintiff was not terminated for failing to write up a subordinate the day an infraction occurred. More importantly, Plaintiff admits that all three alleged infractions occurred and that each infraction constituted a violation of CTA rules.

Based on the above, Plaintiff has failed to show that Defendant's proffered reasons for his termination were a pretext to discrimination.

As to Plaintiff's retaliation claim, there are two distinct routes a plaintiff can pursue in preventing summary judgment in a retaliation claim. *See Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (*Stone*). The first requires that the plaintiff present direct evidence that he engaged in a protected activity and, as a result, suffered an adverse employment action. However, if the defendant presents unrebutted evidence that it would have taken the employment action against the plaintiff even if it had no retaliatory motive, the defendant is entitled to summary judgment because the plaintiff was not harmed by the retaliation. *See Stone*, 281 F.3d at 644.

The second method, as adapted to the *McDonnell Douglas* retaliation context, requires the plaintiff to show that, after filing a charge, only he, and not any other similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. *See Stone*, 281 F.3d at 644; *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). If the plaintiff establishes these matters, the defendant may still present evidence of a noninvidious reason for the adverse action. If the defendant presents

unrebutted evidence of a noninvidious reason for its action, the defendant is entitled to summary judgment. *See Stone*, 281 F.3d at 644.

Plaintiff has established a *prima facie* case of direct evidence of retaliation for purposes of avoiding summary judgment. Plaintiff engaged in the protected activity of complaining about, what he perceived as, discrimination based on his religion, and his employment was subsequently terminated. However, as discussed above, Defendant has presented unrebutted evidence that it would have terminated Plaintiff's employment regardless of any retaliatory motive.

In addition, Plaintiff has failed to establish a *prima facie* case of retaliation via the indirect method of proof. As discussed above, Plaintiff has failed to demonstrate that he was performing his job in a satisfactory manner.

Assuming arguendo, that Plaintiff had established a *prima facie* case of retaliation under this second method, his claim still fails because, as discussed above, Defendant has presented unrebutted evidence of a noninvidious reason for terminating Plaintiff's employment.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Strike Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts and Responses to Defendant's Local Rule 56.1(a)(3) Statement of Facts is granted in part and denied in part. Defendant's Motion for Summary Judgment is granted.

Dated: November 5, 2003

JOHN W. DARRAH
United States District Judge